UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JAMES RUFF,

    Plaintiff,

CASE NO. 07-CV-15443

v.

DISTRICT JUDGE THOMAS LUDINGTON
MAGISTRATE JUDGE CHARLES BINDER

CORRECTIONAL MEDICAL SERVICES;
PAUL PIPER, Doctor;
SEETHA VADLAMUDI, Doctor;
JOHN DOE, CMS Employees,

    Defendants.[1]
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**
**(Dkt. 16, 22)**

### I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that the Motions for summary judgment be **GRANTED**.

### II.    REPORT

    **A.**    **Introduction**

Plaintiff James Ruff is a state prisoner who is currently incarcerated at the Charles Egeler Reception & Guidance Center Annex in Jackson, Michigan. On December 21, 2007, Plaintiff filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983, alleging that his Eighth Amendment right to not have his serious medical needs treated with deliberate indifference was violated when he was housed at the Mound Road Correctional Facility in Detroit, Michigan, in 2006.

---

[1] A previous Report and Recommendation was adopted by U.S. District Judge Ludington on June 4, 2008, resulting in dismissal of Defendants Michigan Department of Corrections and Scott Nobles, Warden. (Dkt. 5, 9.)

On February 22, 2008, U.S. District Judge Thomas L. Ludington referred all pretrial matters to the undersigned magistrate judge. Defendant Correctional Medical Services ("CMS") filed its motion for summary judgment on September 16, 2008. (Dkt. 16.) Plaintiff responded to that motion on September 25, 2008 (Dkt. 19), and Defendant CMS replied. (Dkt. 20.) Defendant Vadlamudi filed a motion for summary judgment on October 17, 2008, (Dkt. 22) and Plaintiff responded to this motion on November 18, 2008. (Dkt. 25.) In addition, Defendant CMS responded to Defendant Vadlamudi's motion, concurring in his argument that Plaintiff has failed to exhaust administrative remedies. (Dkt. 24.)

Upon review of the documents, I conclude that pursuant to E.D. Mich. LR 7.1(e)(2), this motion is ready for Report and Recommendation on the pleadings without oral argument.

**B.      Factual Background and Record Evidence**

Specifically, Plaintiff contends that Defendants' failure to properly treat his hypertension, peripheral vascular disease, deep venous thrombosis and blood clots caused him to suffer a stroke that resulted in blindness in one eye. (Dkt. 19 at 3; Dkt. 25 at 2.)

According to the medical evidence submitted by Plaintiff, Defendants, and by Defendant Vadlamudi's affidavit, Plaintiff was seen by Defendant Vadlamudi on three occasions in the month of September 2005, once in November 2005, and, in 2006, he was seen in February, June, July, August and October. (Dkt. 25 at 58, 64; Dkt. 22 at 28-33.) Defendant Vadlamudi's affidavit also indicates that he treated Plaintiff every six months for asthma and made sure he was taking the proper dosage of medication for his condition. (Dkt. 25 at 64.)

Plaintiff appears to have suffered from at least occasional high blood pressure since 2005. (Dkt. 16 at 68-70.) Plaintiff's blood pressure was more regularly high on occasions leading up to his loss of vision in mid-October of 2006, e.g., 143/99 and 166/106 on August 22, 2006 (Dkt. 25

2

at 35), 167/101 on July 29, 2006, 151/98 on July 30, 2006, 151/97 on July 31, 2007 (returned from hospital), 174/104 and 190/112 on October 3, 2006 (at hospital), and 166/106 on October 4, 2006 (at hospital). (Dkt. 16 at 69, 77.)   Plaintiff was hospitalized and diagnosed with hypertension by Phillip Levy, M.D., on October 3, 2006, and he was prescribed medicine for the condition. (Dkt. 25 at 30-32.)  At that time, Plaintiff's blood pressure was 174/104. (Dkt. 25 at 29.)

Plaintiff was again hospitalized on October 16 through 17 or 18, 2006, and Plaintiff contends that by October 18, 2006, he had suffered a loss of vision. (*Id.*; Dkt. 25 at 42.)  His blood pressure was recorded at 155/102 that day.  (*Id.*)

On October 23, 2006, Plaintiff was experiencing "lower leg pain," was seen by a doctor, was told to follow up with his neurologist in one month, and was to continue a low-salt, low-cholesterol diet.  (Dkt. 25 at 40.)  Two days later, Defendant Vadlamudi approved a request for Plaintiff to be seen at the Kresge Eye Institute.  (Dkt. 25 at 43.)  On December 1, 2006, Plaintiff was treated at the Kresge Eye Institute where he was diagnosed with "central retinal artery occlusion" and "glaucoma."  (Dkt. 25 at 46.)  It was recommended that Plaintiff see a glaucoma specialist within one month and have certain tests performed (a "carotid doppler," a "trans esophageal echocardiogram," and a "coagulative workup").  (*Id.*)  In addition, it was noted that Plaintiff should continue "blood pressure control."  (Dkt. 25 at 47.)

On March 6, 2007, Pricilla Luong, M.D., of the Michigan Heart Corporation, noted that Plaintiff had "significant swelling in the lower extremities if he is not up and about" and that the "left swelling was greater than the right and they were painful at one point in time." (Dkt. 25 at 50.)  At that same time, Mark Zande, M.D., F.A.C.C., noted that Plaintiff's

> patent foramen ovale is very small and although these can be clot-producing, with a shunt left-to-right, it would be a little unusual to get into the arterial circulation, but certainly not impossible. As well, if he had a deep venous thrombosis, this could

> have ended up in the heart and I suppose a little bit of it crossing into the circulation again a little bit unusual due to the left-to-right shunt and not right-to-left shunt. The paroxysmal atrial fibrillation is a possibility. I am a little bit worried about his fatigue and his risk factors for coronary artery disease. I would like to see, aside from an ANA and D-dimer, an EKG. I would also like to see Doppler of the lower extremities and an Adenosine Myoview stress test.

(Dkt. 25 at 51.)

On May 30, 2007, Richard Byler, M.D., wrote to Dr. Luong, interpreting the recent Adenosine Myoview stress test as "normal, showing no ischemia and no infarction with a left ventricular ejection fraction of 70%" and an "ultrasound of his leg showing chronic thrombosis of the left femoral and left common femoral veins." (Dkt. 25 at 52.) Dr. Byler also noted that a "Holter monitor" revealed "chronic bradycardia with an average heart rate of only 51 beats per minute." (*Id.*) Dr. Byler recommended "long-term anticoagulation with Coumadin, chronically." (*Id.*)

On April 19, 2007, Libby Anderson, M.D., noted "partial compression of the left common femoral vein and femoral vein, but this appears to be due to chronic thrombosis (along the wall) rather than acute thrombosis (clot in the lumen)." (Dkt. 25 at 53.) On November 3, 2008, Plaintiff was diagnosed with "central retinal AA occlusion; blind OD; HTN retinopathy; CAT; OAG." (Dkt. 25 at 48.)

    **C.**    **Motion Standards**

A motion for summary judgment will be granted under Rule 56(c) of the Federal Rules of Civil Procedure where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). All facts and inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The moving

party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citing *Celotex Corp. v Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). In determining whether the moving party has met its considerable burden, a court may consider the plausibility of the moving party's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party is unable to meet its burden of proof. *Celotex*, 477 U.S. at 326.

In response, the non-moving party cannot rest merely on the pleadings alone. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). When the nonmoving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. Instead, the court will rely upon the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992). The Sixth Circuit has explicitly instructed that it is "utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the motion." *Id.* at 406.

After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52).

Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

### D.     Exhaustion of Administrative Remedies

Defendant Vadlamudi raises the affirmative defense of failure to exhaust administrative remedies. Prisoner civil rights cases are subject to the Prison Litigation Reform Act's ("PLRA") mandate that "[n]o action shall be brought with respect to prison conditions under § 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Suits "brought with respect to prison conditions" includes "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002). To exhaust a claim, a prisoner must proceed through all of the steps of a prison or jail's grievance process, because an inmate "cannot abandon the process before completion and claim that he has exhausted his remedies." *Hartsfield v. Vidor*, 199 F.3d 305, 309 (6th Cir. 1999). The Supreme Court held in *Woodford v. Ngo*, 548 U.S. 81, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006), that failure to "properly" exhaust bars suit in federal court. "Proper exhaustion" means that the plaintiff complied with the administrative "agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id*. at 2386.

The Supreme Court provided further clarification of the PLRA's exhaustion rule in *Jones v. Bock*, 549 U.S. 199, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007). Although Plaintiff contends that *Jones v. Bock* held that a "prisoner need NOT exhaust his remedies under the Litigation Reform Act," (Dkt. 28 at 1), Plaintiff is mistaken. Instead, the *Jones* Court struck down the Sixth Circuit's

6

procedural rule placing the burden on prisoners to plead and prove exhaustion in their complaint, holding instead that failure to exhaust is an affirmative defense that must be raised by the defendant. *Id.* at 921. The Court further held that "[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but **it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion**." *Jones,* 127 S. Ct. at 922-23 (emphasis added).

The Michigan Department of Corrections provides prisoners with a grievance procedure for bringing forward their concerns and complaints. *See* MDOC Policy Directive ("PD") 03.02.130 (eff. Dec. 19, 2003).[2] The MDOC's grievance procedure consists of steps that a prisoner must follow prior to filing a complaint in court, and each step is accompanied by a time limit. First, within two business days after becoming aware of a grievable issue, an inmate should attempt to verbally resolve the dispute with those involved. MDOC PD 03.02.13(R). If such an attempt is impossible or unsuccessful, the inmate must then submit a Step I grievance form within five days. MDOC PD 03.02.130(X). The grievance policy provides the following instructions regarding what information needs to be included in a grievance:

> The issues shall be stated briefly. Information provided shall be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how). **Dates, times, places and names of all those involved in the issue being grieved are to be included.**

MDOC PD 03.02.130(T) (emphasis added).[3]

---

[2] The policy directive was superceded on March 5, 2007. However, since the December 2003 version was in effect at the time of the grievances at issue here, all references herein will be to that version.

[3] I note that the MDOC grievance policy referred to by the Supreme Court in *Jones v. Bock* was the November 1, 2000, version, *see Jones*, 127 S. Ct. at 916, which did not require inmates to include in their grievances the dates, times, places and names of all those involved. The policy directive at issue here – the December 2003 version – clearly requires this higher level of specificity.

7

The prison staff is required to respond in writing to a Step I grievance within fifteen days, unless an extension is granted. MDOC PD 03.02.130(Y). If the inmate is not satisfied with the response, or does not receive a response within fifteen days, he then must request a Step II appeal form within five days, and has an additional five days to submit it. MDOC PD 03.02.130(DD). Once again, if the inmate is dissatisfied with the response at Step II or does not receive a Step II response within fifteen days, he has ten business days to submit a Step III appeal to the Prisoner Affairs Section. MDOC PD 03.02.130(HH). The Step III response concludes the administrative grievance process.

### 1.      Grievance NRF-2007-06035412D

Defendant CMS argues that Plaintiff filed a relevant grievance (NRF-2007-06035412D),[4] but that "[t]here is no evidence that Plaintiff advanced this grievance beyond Step I." (Dkt. 16 at 4, Ex. E.) Defendant Vadlamudi argues that even if this grievance was exhausted, it did not pertain to the arguments contained in the instant complaint against him. (Dkt. 22 at 13-14.)

Contrary to Defendant CMS's assertion, Plaintiff does not have to provide evidence of exhaustion, Defendant CMS needs to provide evidence of lack of exhaustion since it is an affirmative defense. *See Jones v. Bock, supra*. Furthermore, even though not required, Plaintiff has provided evidence of exhaustion of grievance NRF-2007-06035412D through the Step III denial. (Dkt. 19 at 11 (Step I), 12 (Step II Appeal Response), 13 (Step II), 14 (Step III Response).) Defendant Vadlamudi has, in fact, also provided that same evidence, a fact which Defendant CMS failed to recognize. (*See* Dkt. 22 at Ex. E.) Finally, a simple "grievance inquiry" report would have provided Defendant CMS with the same evidence of Plaintiff's exhaustion. (Dkt. 22 at 35.)

---

[4]Defendant's brief lists the grievance as beginning with a "W" rather than an "N;" however, Exhibit E and Plaintiff's response clearly indicate the grievance referenced begins with an "N."

8

Since the grievance inquiry report and Plaintiff's documentation support a finding that Plaintiff has exhausted his administrative remedies, I suggest that Defendants have not met their burden of proving the affirmative defense of lack of proper exhaustion. Therefore, I suggest that summary judgment in favor of Defendants be denied on this ground.

Furthermore, I find unpersuasive Defendant CMS's reply that "Plaintiff also seems to be arguing that he did not have to exhaust under the applicable MDOC procedural rule, MDOC Policy Directive 03.02.130[.]" (Dkt. 20 at 4.) It appears to the Court that Plaintiff is complaining instead that the MDOC did not comply with their own policy of responding in a timely manner, because the policy states that the "total process" from Step I to Step III should have been "less than 90 days," but instead in this case it took "eleven months." (Dkt. 19 at 14.)[5]

### 2.     Grievance NRF-2005-07943 12D3

Defendant Vadlamudi notes that Plaintiff also filed another grievance (NRF-2005-0794312D3) during the relevant time period. (Dkt. 22 at 12.) However, Defendant Vadlamudi argues that neither of these grievances are exhausted as to himself because they do not specify "how or why [Plaintiff] believes that Dr. Vadlamudi ignored his serious medical needs," nor do they speak to "hypertension." (Dkt. 22 at 13.) However, Defendant Vadlamudi concedes that Plaintiff did mention him by name in the grievance as required by MDOC policy.

 I suggest that Defendant Vadlamudi's argument seeks to impose a burden on prisoners to allege specific medical diagnoses and causation elements in order to exhaust. Such a burden is far more demanding than either the law or the MDOC policy requires. *See Fischer v. Federal Bureau of Prisons*, No. 5:06-cv-407-Oc-10GRJ, 2007 WL 2702341, at *6 (M.D. Fla. Sept. 14, 2007)

---

[5] Plaintiff does erroneously argue that the U.S. Supreme Court's decision in *Jones v. Bock* relieves him of the obligation to exhaust administrative remedies, but that argument has already been defeated under the exhaustion requirements section of this Report.

9

(denying summary judgment and rejecting defendant's argument that plaintiff had not properly exhausted because he had not made any "particularized" claim regarding his medical care where plaintiff had complained of delayed and inadequate care as to his kidney and prostate problems; these complaints were sufficient to put defendant on notice as to the nature of his claims).

Accordingly, I suggest that summary judgment in favor of Dr. Vadlamudi on the grounds of failure to exhaust be denied.

### E.   Eighth Amendment Claim

#### 1.   Legal Standards

The Supreme Court held in *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976), that the deliberate indifference to serious medical needs of prisoners constitutes unnecessary and wanton infliction of pain in violation of the Cruel and Unusual Punishments Clause of the Eighth Amendment to the Constitution. The Court explained that "[t]his conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Id*. at 105.

The standard for deliberate indifference is two-pronged, consisting of both a subjective and an objective element. *Wilson v. Seiter*, 501 U.S. 294, 111 S. Ct. 2321, 2323, 115 L. Ed. 2d 271, 279 (1991). In order to satisfy the objective component of an Eighth Amendment claim, the plaintiff must show that he "is incarcerated under conditions posing a substantial risk of serious harm," *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed.2d 811 (1994); *Stewart v. Love*, 796 F.2d 43, 44 (6th Cir. 1982), or that he has been deprived of the "minimal civilized measure of life's necessities," *Wilson*, 501 U.S. at 298 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981)). Thus, mere inadequate medical treatment is not sufficient to state a violation of the Eighth Amendment. In *Estelle,* the Supreme Court explained:

10

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. **Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.** In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Estelle*, 429 U.S. at 105-06 (emphasis added) (quotations omitted).

As recognized in *Estelle*, differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnoses or treatment are insufficient to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995). The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Where, as here, "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*

### 2. Defendant CMS

Defendant CMS argues that "Plaintiff's only allegations against CMS are that it is somehow vicariously liable for the actions of the Defendant health professionals." (Dkt. 16 at 14.) Defendant CMS contends that Plaintiff has not alleged facts amounting to deliberate indifference under the Eight Amendment. (Dkt. 16 at 14-15.)

It is beyond dispute that liability under § 1983 must be based on active unconstitutional behavior, not on a failure to act. *See Green v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002); *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999); *Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 206 (6th

11

Cir. 1998) (liability must be based upon active unconstitutional behavior). *See also Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991) (stating that to establish personal liability of a government official under § 1983, a plaintiff must show that the official *caused* the deprivation of a federal right).

Furthermore, liability under section 1983 must be based on more than merely the right to control employees. *Polk Co. v. Dodson*, 454 U.S. 312, 325-26, 102 S. Ct. 445, 70 L. Ed. 2d 509 (1981); *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Thus, section 1983 liability cannot be premised upon mere allegations of *respondeat superior*. *Monell*, 436 U.S. at 691; *Polk*, 454 U.S. at 325. A party cannot be held liable under section 1983 absent a showing that the party personally participated in, or otherwise authorized, approved or knowingly acquiesced in, the allegedly unconstitutional conduct. *See, e.g., Leach v. Shelby Co. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989); *Hays v. Jefferson*, 668 F.2d 869, 874 (6th Cir. 1982); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). Plaintiff has not alleged that Defendant CMS implicitly encouraged, authorized, approved or acquiesced in any way. Plaintiff's specific allegations point only to individual health care professionals. Therefore, I suggest that Defendant CMS is entitled to dismissal on this ground alone.

### 3.     Defendant Vadlamudi

Defendant Vadlamudi argues that "Plaintiff is unable to show anything more than a mere disagreement over the course of care provided to him by Dr. Vadlamudi." (Dkt. 22 at 16.) Plaintiff focuses on Defendants' failure to properly treat his hypertension, peripheral vascular disease, deep venous thrombosis and blood clots resulting in a stroke that caused blindness in one eye. (Dkt. 19 at 3; Dkt. 25 at 2.)

The medical evidence submitted by the parties reveals that Plaintiff received regular medical care and prescription medication before and after the loss of vision he suffered. Defendant was treated by Defendant Vadlamudi every six months for asthma and on average around once a month for his other medical concerns from September of 2005 through October of 2006. (Dkt. 25 at 58, 64; Dkt. 22 at 28-33.) Plaintiff's blood pressure was notably high beginning in July of 2006, he was taken to the hospital on the two occasions when it became dangerously high in July of 2006, and again on October 3, 2006. (Dkt. 16 at 69, 77.) Plaintiff was diagnosed with hypertension on October 3, 2006, and was prescribed and given appropriate medication. (Dkt. 25 at 30-32.)

Two weeks after this diagnosis, Plaintiff was again hospitalized for two days, at which time he suffered a loss of vision. (*Id.*; Dkt. 25 at 42.) Within a week of his loss of vision, Defendant Vadlamudi approved a request for Plaintiff to be seen at the Kresge Eye Institute. (Dkt. 25 at 43.) Within another month, Plaintiff was treated at the Kresge Eye Institute where he was diagnosed with "central retinal artery occlusion" and "glaucoma." (Dkt. 25 at 46.)

Plaintiff was still experiencing leg pain due to swelling, especially in the left leg, in March of 2007, at which time he was treated by Drs. Long and Zande. (Dkt. 25 at 50-51.) At that time, Dr. Zande was concerned about potential deep venous thrombosis, but none was found to be present. (Dkt. 25 at 51.) Dr. Zande recommended several tests that were performed within two months and which revealed, per Dr. Byler's interpretation, "chronic thrombosis of the left femoral and left common femoral veins." (Dkt. 25 at 52.) Plaintiff was then placed on anti-coagulation medicine. (*Id.*) In April 2007, Dr. Anderson confirmed that Plaintiff did not suffer from any acute thrombosis, i.e., "blood clot," but rather did show some chronic thrombosis present along the wall of the femoral vein. (Dkt. 25 at 53.)

I suggest that the medical evidence does not support Plaintiff's notion that he had deep vein thrombosis or blood clots, nor does it reveal that those conditions caused his stroke. Plaintiff did suffer from hypertension, but received medical care for that condition and was hospitalized when his hypertension reached critical levels. Deliberate indifference has been found lacking where inmates received much less care than did this Plaintiff. *Hood v. Prisoner Health Services, Inc.*, 180 Fed. App'x 21, 25 (10th Cir. 2006) (failing to diagnose blood clots , denial of pain medication, and refusal to send plaintiff to a specialist did not state an Eighth Amendment violation because "inadvertent or negligent failure to provide medical care, however serious the consequences, does not rise to 'deliberate indifference . . .'").

To the extent that Plaintiff's claim alleges deliberate indifference on the part of medical staff at the hospital, I suggest that these medical personnel cannot be held responsible for any failures that occurred while Plaintiff was treated at the hospital. *See Mabry v. Antonini*, 289 Fed. App'x 895, 901 (6th Cir. 2008) (granting summary judgment to individual doctor where he had no control over when appointments would be scheduled and "did all he could" to help the plaintiff; liability must be based on the actions of the defendant in the situation he faced, not on any problems or errors caused by the acts of others).

I suggest that Plaintiff's assertion that he would have fared better with different care for his conditions, when taken in light of the evidence that he received prompt and appropriate care, fails to even approach a claim for deliberate indifference. These allegations instead amount only to a difference in medical judgment between an inmate and prison medical personnel, which does not implicate a constitutional claim. *See Warren v. Nelson*, No. 2:05-CV-81, 2007 WL 677164, at *4 (E.D. Tenn. Mar. 1, 2007) (granting summary judgment on Eighth Amendment claim where, "though it was ultimately proven to be the wrong treatment (because the diagnosis was wrong),

14

the plaintiff received a great deal of medical attention and treatment and there are no facts to show that it was cursory.").

I further suggest that Plaintiff's opinion is insufficient to establish deliberate indifference. *See Woods v. Siddiq*, No. 2:04-CV-1221-WKW, 2006 WL 1663566, at *3 (M.D. Ala. June 14, 2006) (dismissing case where plaintiff alleged he suffered a stroke as a result of delayed medication but failed to present any medical evidence to establish that the stroke was the result of defendant's actions or that the delay was a disregard of a known risk, noting that plaintiff's "own unsubstantiated opinions" were insufficient to create a genuine issue of material fact).

I therefore suggest that this case does not present a scenario where "the need for treatment [was] obvious, [and where the] medical care [given was] so cursory as to amount to no treatment at all [and thus,] amount[ed] to deliberate indifference." *Terrance v. Northville Regional Psychiatric Hospital*, 286 F.3d 834, 843-44 (6th Cir. 2002) (denying summary judgment where plaintiff died when defendants permitted him to go outside when the temperature was 95 degrees, the humidity was 90 percent with a heat index of 148, and where defendants were aware that the plaintiff was an obese diabetic who had hypertension and who was on prescription drugs that made him vulnerable to dehydration and heat stroke).

I further suggest the evidence does not reveal a situation where Plaintiff's severe symptoms were ignored, suspected problems were not confirmed, or where hospital care was withheld. *See Phillips v. Roane County, Tenn.*, 534 F.3d 531, 541 (6th Cir. 2008) (Plaintiff repeatedly complained of deteriorating condition, including chest pains, numbness on the left side, dizziness, vomiting, nausea, constipation, and possible kidney infection and fellow inmate described plaintiff as obviously "extremely sick").

Finally, I suggest there is no evidence that Plaintiff suffered obvious or typical symptoms of a stroke that were ignored. *See Pimentel v. Deboo*, 411 F. Supp. 2d 118, 128-29 (D. Conn. 2006) (denying motion to dismiss Eighth Amendment claim where plaintiff alleged that she had twice reported to the medical department exhibiting signs of stroke, i.e., severe head pain, slurred words, and being unable to grasp with her right hand).

I therefore recommend that summary judgment be granted in favor of Defendants because Plaintiff has failed to allege and support an Eighth Amendment claim of deliberate indifference to his serious medical needs.

### III. REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

          s/ *Charles E Binder*
          CHARLES E. BINDER
Dated: January 7, 2009          United States Magistrate Judge

## **CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date and served on James Ruff #157098 by First-Class Mail at Charles Egeler Reception and Guidance Center Annex, 3855 Cooper Street, Jackson, MI 49201, and served on U.S. District Judge Thomas Ludington in the traditional manner.

Dated:  April 11, 2008                                      By      s/Patricia T. Morris
                                                                                 Law Clerk to Magistrate Judge Binder